FILED

2022 Mar-15  PM 01:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JAMES ANDERSON,    )
         )
  Plaintiff,    )
         )
vs.        )
         ) Case No.: 2:18-cv-01836-JHE
ABB INSTALLATION PRODUCTS, INC., )
         )
  Defendant.    )
         )

## MEMORANDUM OPINION[1]

In this products liability case, Plaintiff James Anderson ("Anderson") asserts Defendant ABB Installation Products, Inc. ("ABB") violated the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), committed negligence and wantonness under Alabama law, and unlawfully failed to warn him of danger when an alleged manufacturing defect in a voltage sensor ABB manufactured caused an electrical arc flash injuring Anderson. (Doc. 1). ABB moves for summary judgment, (doc. 40), Anderson moves for partial summary judgment as to ABB's affirmative defenses, (doc. 46), and both parties filed motions in limine to exclude expert witness testimony, (docs. 42 & 48). Each motion is briefed and ripe for review. For the reasons stated below, each motion in limine is **DENIED**, ABB's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, and Anderson's motion for partial summary judgment is **DENIED** except for a few affirmative defenses, which will be stricken.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 11).

# I. Standards of Review

## A. Motions in Limine

The motions in limine in this case challenge the admissibility of expert witness testimony under Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, "Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific [and technical] evidence."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (emphasis omitted) (citing *Daubert*, 509 U.S. at 589 n.7, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).  The gatekeeping function "'inherently require[s] the trial court to conduct an exacting analysis' of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.* (emphasis omitted) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)).  In doing so, district courts must consider whether (1) the expert is qualified to testify; (2) the expert's methodology is sufficiently reliable; and (3) the testimony assists the trier of fact.  *Id.* "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them."

*Id.*  And "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."  *Id.*

### B. Motions for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the non-moving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial."  *Id.* at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are

legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Facts

This case arises out of an arc flash that injured Anderson while he was working on electrical equipment ABB manufactured and sold.

Anderson was employed by Alabama Power Company ("Alabama Power") as a lineman. (Doc. 49-4 at 8 (25:19-26:4)). On August 31, 2018, Anderson and others were working on equipment in an electrical switchgear cabinet located near St. Vincent's Hospital in Birmingham, Alabama as part of a project to transfer the hospital's electricity source from an overhead feed to an underground feed. (*Id.* at 9 (31:14-17), 13 (46:6-47:8)). The switchgear cabinet housed six Elastimold® 650 REVSIB 15 KV Resistive Elbow Voltage Sensors ("voltage sensor") manufactured and sold by ABB. (Doc. 49-1 at 16 (52:14-19), 31 (110:4-111:2, 111:17-112:4); doc. 49-4 at 14 (50:10-13)). Each voltage sensor had a removable insulating cap. (Doc. 49-1 at 27 (96:11-19), 29 (103:2-11)). Each insulating cap was attached to a ground wire, also known as a bleeder wire. (*Id.* at 26 (92:8-11), 29 (103:12-15)).

While working, Anderson removed the insulating caps from three of the voltage sensors using an eight and a half foot-long hot stick. (Doc. 49-3 at 14 (50:1-5), 15 (53:1-22); doc. 49-8 at 20 (66:3-16)). Later, as he was placing the insulating cap back onto the first voltage sensor using the same hot stick, an arc flash occurred. (Doc. 49-3 at 15-16 (56:13-57:7, 58:12-22)). The arc flash injured Anderson. (Doc. 41 at 5-6, ¶ 1; doc. 59 at 10).

4

Anderson alleges ABB manufactured and sold the voltage sensor with a latent manufacturing defect that caused the arc flash.  (Doc. 1 at 4-5, ¶¶ 16-23).  He asserts three causes of action against ABB: (1) AEMLD, the judicially created products liability doctrine that holds sellers of defective products liable for injuries caused by those defective products, *see Morguson v. 3M Co.*, 857 So. 2d 796, 800 (Ala. 2003); (2) negligence and wantonness; and (3) failure to warn.  (*Id.* at 6-8).  ABB raises 13 affirmative defenses to Anderson's claims.  (Doc. 5 at 4-5).  ABB moves for summary judgment on all of Anderson's claims (doc. 40), and Anderson moves for partial summary judgment on some of ABB's affirmative defenses. (doc. 46).  Both parties move to exclude several of the other party's expert witnesses.  (Docs. 42 & 48).  ABB moves to exclude Anderson's expert retained to investigate the cause of the arc flash and his expert retained to investigate ABB's quality management system for the cause of the arc flash.  (Doc. 42).  Anderson moves to exclude ABB's expert retained to testify about the manufacture and functionality of the voltage sensor, its expert retained to investigate the cause of the arc flash, and its expert retained to testify about Anderson's medical conditions and injuries.  (Doc. 48).

### III. Analysis of Motions in Limine

#### A. ABB's Motion to Exclude John Averrett

Anderson's expert witness John Averrett ("Averrett") is an electrical engineer with more than 25 years of experience designing electrical systems, has been the engineer of record for hundreds of projects, and has opined on electrical topics such as arc flashes, lightning strikes, electrical fires, and grounding in more than 25 cases.  (Doc. 56-10 at 2).  Anderson retained Averrett to "evaluate [Anderson's] case and offer opinions on what may have caused the flash over."  (*Id.*).

Two reports of the incident were foundational to Averrett's opinions.  First, Alabama Power prepared an "Event Learning Report" on October 1, 2018, that detailed the incident and listed potential causes of the arc flash.  (Doc. 55-1).  Second, ABB's investigative team prepared a report on November 1, 2018, documenting an analysis of the voltage sensor and insulating cap and providing opinions regarding the root cause of the arc flash.  (Doc. 55-2).

According to his expert report, Averrett reviewed all reports of the incident and "went a step further and investigated the actual switch gear, the hot stick, static electricity, and user error." (Doc. 56-10 at 4).  He evaluated seven possible causes of the arc flash: (1) debris inside of the insulating cap; (2) the bleeder wire becoming stuck between the insulating cap and the voltage sensor; (3) some issue with the switchgear in the cabinet; (4) some issue with the hot stick; (5) static electricity; (6) user error; and (7) a manufacturing defect in the voltage sensor.  (*Id.* at 4-7).

Averrett ruled out debris as a cause of the arc flash because Anderson's and other linemen's testimony established that Anderson hung the insulating caps over the cabinet door when he removed them, "which means that the open end of the cap would be facing downward thereby limiting the amount of debris that could enter the cap."  (*Id.* at 5).  Also, Averrett noted how ABB's report identified "no signs of electrical tracking" on the insulating cap, and, according to Averrett, evidence of electrical tracking would be present if debris was in the insulating cap.  (*Id.*).

Averrett opined the bleeder wire could not have become stuck between the insulating cap and the voltage sensor because "Anderson and other linemen on site that day have all testified that this did not happen and, given the basic laws of physics, this is an extremely unlikely scenario." (*Id.*).  Averrett reported the way Anderson removed the insulating cap with the hot stick prevented the bleeder wire from interfering with the reseating of the insulating cap.  (*Id.*).  As an experiment, Averrett tried by hand to make the bleeder wire become stuck between the insulating cap and a

sample voltage sensor and found it impossible.  (*Id.*).  The bleeder wire also was too heavy, ridged, and pulled down by gravity to become stuck.  (*Id.*).  Alabama Power's incident report stated the bleeder wire involved was not known to create such a large arc flash.  (*Id.*).

Averrett visually inspected the switchgear in the cabinet and found it unremarkable besides the arc flash marks.  (*Id.* at 6).  A functional test of the switchgear Averrett requested and observed showed no issues.  (*Id.*).  He also visually inspected the hot stick and found it unremarkable.  (*Id.*).  He ruled out static electricity and user error because all witnesses testified that the insulating cap and bleeder wire were installed properly, and Anderson handled all equipment reasonably.  (*Id.*).

Averrett noted both Alabama Power's report and ABB's report alluded to unknown manufacturing defects as a possible cause of the arc flash.  (*Id.* at 6; *see* doc. 55-1 at 2; doc. 55-2 at 2).  Averrett opined that, because the equipment was successfully operating prior to the incident, a latent manufacturing defect manifested itself when Anderson unseated the insulating cap.  (Doc. 56-10 at 7).  Averrett stated, "Either the routine exterior force used or the manufactured internal pressure released when Mr. Anderson was unseating the insulated cap was more likely than not the event that exacerbated an unknown existing defect in the Elastimold Product as suggested by [ABB's] report."  (*Id.*).  Averrett also was persuaded by Alabama Power's report that the arc flash was "unusually large," stating "[w]hen Mr. Anderson reseated the insulated cap, the internal conductive material was exposed because of the defect in the Elastimold Material and this conductive material came into contact with the external conductive jacket causing the phase-to-ground fault and subsequent flash over."  (*Id.*).  Averrett concluded his expert report with his opinion that a manufacturing defect "was more likely than not the root cause" of the arc flash based on his knowledge, review of information provided to him, and research dismissing several other possible causes.  (*Id.*).

In its motion in limine, ABB contends Averrett should be disqualified as an expert and prevented from testifying under Rule 702 because he is not qualified to render his opinions, his methods are unreliable, and his testimony is purely speculative and therefore not helpful to a jury. (Doc. 43 at 1). For the following reasons, the undersigned disagrees.

### 1.  Whether Averrett is Qualified to Render His Opinions

Starting with the qualification prong, ABB asserts Averrett is not qualified to testify as an expert in this case because he does not have experience in forensic investigation of an arc flash, in the manufacture of switchgear products, or with ABB voltage sensors. (*See* doc. 43 at 7-15). As evidence, ABB cites certain admissions Averrett made at his deposition: he has not had any course work or training in forensic engineering; he is not a member of the National Academy of Forensic Engineers; he does not have any certifications or qualifications in the area of forensic engineering; he has not written any papers or articles on forensic engineering; he has not given any lectures on the subject of forensic engineering; he has not taught any classes on forensic engineering; he never had a job solely devoted to forensic engineering; his CV does not mention the word "forensic;" this case was his first investigation into an arc flash; he never worked for a manufacturing company, much less any company that manufactured switchgear products; his only experience in injection molding—the process by which ABB manufactured the voltage sensor with Elastimold material—is in designing power for injection molding machines; he has no hands-on experience with the manufacturing process of electrical products like those involved in this case; he did not know any Institute of Electrical and Electronics Engineers ("IEEE") standards off the top of his head; he had never seen a 650REVSIB before this case; he did not know why electric utilities use load break products; he did not know about ABB's manufacturing, quality control, inspection, or testing processes and procedures; he could only identify Elastimold as a material out of which the

voltage sensor is molded and did not know the material components or properties of Elastimold; and he did not know whether the exterior material of the insulating cap was insulative or conductive.  (Doc. 56-7 at 4-5 (11:13-14:2), 6 (18:10-20:22), 14 (49:17-51:17), 15 (55:2-56:22), 17 (64:3-12), 18 (68:9-17), 22 (82:1-84:9)).   Averrett's admissions convincingly demonstrate he is far from the most qualified expert on arc flashes involving ABB voltage sensors.  However, he still is qualified to testify as an expert under Rule 702.

Averrett has worked on more than 25 cases over the past four years providing expert testimony and advice on topics such as arc flashes, forensic investigations, transformers, power systems, utility lines, breakers, electrical panels, electrical explosions, lightning strikes, lightning preparedness systems, electrical fires, and grounding.  (*See id.* at 7-10 (21:10-34:22); doc. 56-11).   His descriptions of those cases and his roles in them demonstrate he has extensive experience with investigating the causes of numerous kinds of electrical accidents.  (*See id.*).  This case is, of course, about the cause of an electrical accident, and the accident involves circumstances well within Averrett's expertise.  Therefore, Averrett is at least minimally qualified under Rule 702 to testify as an expert on the possible cause of the arc flash.

To be clear, Averrett's prior experience with arc flashes is limited.  He had never before this case provided litigation support by investigating the cause of an arc flash.  (*Id.* at 6 (19:21-20:1)).  Instead, he advised an attorney on background information about arc flashes in a personal injury case involving an electrocution.  (*Id.* at 8 (27:1-13); doc. 56-11 at 3).  He also provided unspecified litigation support in two other cases involving arc flashes, (*see* doc. 56-11 at 3), but he did not provide any pertinent details about those cases or his roles in them, (*see* doc. 56-7 at 9 (32:4-20), 10 (33:15-34:8)).  Moreover, he has no specialized knowledge of ABB's manufacturing

and testing processes and had never worked with the voltage sensor involved in this case.  (*Id.* at 6 (18:18-22), 14 (49:17-51:17), 22 (83:4-84:9)).[2]

Even so, case law in the Eleventh Circuit establishes that an expert's experience and knowledge does not have to be so narrowly tailored to the exact subject of a case to satisfy Rule 702.  *See, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (finding an economist with no real estate development experience was qualified to offer an expert opinion regarding the plaintiffs' lost value damages reflecting the amount of money that each plaintiff would have earned if the funds allegedly taken by the defendants were available for investment in U.S. real estate); Order, *Norfolk S. Ry. Co. v. Boatright R.R. Prod., Inc.*, No. 2:17-CV-01787-AKK (N.D. Ala. Apr. 6, 2021), ECF No. 190 at 10-11 (finding an expert on wood preservatives was qualified to testify about the preservation of wooden railroad ties even though the expert's experience was mostly in utility poles and not railroad ties); *Vigneulle for Est. of Vigneulle v. Tahsin Indus. Corp. USA*, No. 2:15-CV-02268-RDP, 2018 WL 1509435, at *4 (N.D. Ala. Mar. 27, 2018) (finding a safety engineer was qualified to offer expert testimony about fall prevention and safety harnesses in a case where the plaintiff alleged wrongful death caused by a defective tree climbing harness even though the engineer was not a mechanical engineer or an accident reconstructionist); *Vaughn v. Hyster Co.*, No. 4:09-CV-570-VEH, 2010 WL 9936530, at *8 (N.D. Ala. Dec. 3, 2010), *aff'd sub nom. Vaughn v. Nacco Materials Handling Grp., Inc.*, 440 F. App'x 821 (11th Cir. 2011) ("[I]t is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render the opinion at issue because the witness lacks a certain educational or other experiential background."); *W.J. v. Liquid Transp. Corp.*, No. 2:17-CV-0191-

---

[2] Before this case, Averrett had "specified ABB products and . . . been involved in projects that utilize ABB products, ABB salesmen or distributors that represent ABB products have been in and out of the office over the years."  (Doc. 56-7 at 13 (47:17-48:3)).

CG-B, 2018 WL 3432532, at *6 (S.D. Ala. July 13, 2018) (finding an engineer's "knowledge of accident reconstruction and general experience with vehicle braking systems" was "at least minimally adequate to qualify him to testify about" a tractor-trailer's allegedly defective brake system even though he "ha[d] no certifications as a brake inspector," "[did] not hold himself out to be a brake expert," "[did] not claim to have any expertise in compliance with the Federal Motor Carrier Safety Regulations," and "[did] not perform pre-trip inspections on tractor-trailers"); *Nicholson v. Pickett*, No. 1:13-CV-322-WKW, 2016 WL 854370, at *11 (M.D. Ala. Mar. 4, 2016) (finding that a mechanic was qualified to testify as an expert about how a brake system failed in a military truck even though he was unfamiliar with that specific truck and its brake system and had never offered an expert opinion on the design and manufacture of a military truck); *Armstrong v. HRB Royalty, Inc.*, No. CIV.A. 03-0148-WS-C, 2005 WL 6007684, at *3 (S.D. Ala. Oct. 14, 2005) ("An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand.").

This case falls within the above group of cases. Although Averrett had never before this case investigated the cause of an arc flash and especially not an arc flash involving the particular voltage sensor at issue in this case, his extensive experience with and knowledge of electrical accidents qualifies him to offer expert opinions regarding the possible cause of the arc flash.

### 2.   Whether Averrett 's Opinions and Methodology are Reliable

Next, ABB challenges the reliability of Averrett's opinions and methodology. An expert witness's testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and the expert must "have reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702(b)-(d). "To evaluate the reliability of scientific expert opinion, [courts] consider, to the extent practicable: (1) whether the expert's theory can be and has

been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.* Sometimes those specific factors "will aid in determining reliability," but "sometimes other questions may be more useful." *Id.* Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and "[e]xactly *how* reliability is evaluated may vary from case to case." *Id.* (emphasis in original) (internal quotation marks omitted).

Here, ABB asserts Averrett's experiment—attaching the insulating cap to an exemplar voltage sensor with his hands to examine whether the bleeder wire could have become trapped in the cap—is unreliable because Anderson used a hot stick to reseat the cap. (Doc. 43 at 16). ABB also points to several concessions Averrett made at his deposition as purported evidence of unreliability: he did not visit the plants where the voltage sensor was manufactured; he did not study the strength, chemical, physical, tensile, density, or thermal properties of the incident voltage sensor's materials; he did not test the amount of force required to cause the insulating material on the incident voltage sensor to fail; he only visually examined and briefly handled the voltage sensor; he never examined the voltage sensor in a laboratory; he did not take any scans of the voltage sensor; he did not use a scope to inspect whether remnants of interface material were in the insulating cap; he did not use a scope to see whether any signs of weakness or a defect were in the voltage sensor interface; he made no notes memorializing his work other than notations he made on ABB drawings; he did not measure the dimensions of any materials in the voltage sensor;

he did not perform any experiments on the incident voltage sensor to test potential theories of liability and instead only tested such theories on an exemplar voltage sensor; he did not test whether the incorrect seating of the insulating cap could cause carbon build-up; he did not test for any evidence of arcing inside the insulating cap; and he was not aware of various American Society for Testing and Materials and National Fire Protection Association standards that ABB contends would apply to his investigation.  (Doc. 56-7 at 13-15 (45:6-9, 49:17-50:1, 53:11-54:17), 17-20 (61:17-63:20, 68:2-14, 72:6-73:17), 23 (85:4-9), 25 (94:9-11), 29 (109:20-111:8)).

All of ABB's arguments go to the weight and credibility of Averrett's opinions, not the reliability of his methods under Rule 702.  *See e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1345-46 (11th Cir. 2003) (concluding that "[a]lthough Quiet designates several additional elements of Frank's study as methodologically flawed, . . . and argues that his testimony consequently was unreliable, the foregoing analysis applies with equal force to these contentions; appellant's arguments go to the weight, not the admissibility, of the evidence he offered").  The list of what Averrett did not do does not override the reliability of what he did do.  Averrett performed an engineering root cause analysis by analyzing seven possible causes of the arc flash.  (Doc. 56-10 at 4-7).  He documented reliable methodology for ruling out six of those possible causes.  (*See id.* at 4-6).  In ruling out debris as a possible cause, he explained how the orientation of the insulating cap while Anderson was handling it would limit the amount of debris that could enter it, described testimony that the insulating caps were clean prior to installation, and explained that the lack of evidence of electrical tracking noted in ABB's report suggested debris was not the cause of the arc flash.  (*Id.* at 4-5).

In ruling out the bleeder wire as a possible cause of the arc flash, Averrett stated, "Mr. Anderson and other linem[e]n on site that day have all testified that this did not happen and, given

the basic laws of physics, this is an extremely unlikely scenario." (*Id.* at 5). He gave several details: Anderson gently tugged on the bleeder wire to ensure that it was connected; "the insulated cap at the end of the hot stick was most likely oriented with the bleeder wire connection at the bottom . . . thereby not letting the bleeder wire interfere with the installation of the insulated cap;" Averrett considered whether the bleeder wire connection could have been "oriented at the top while the insulated cap was on the end of the hot stick;" Averrett tried by hand to make a bleeder wire become stuck in an exemplar insulating cap and found it impossible because the bleeding wire was too heavy and ridged and was pulled down by gravity;[3] and Averrett noted how Alabama Power's incident report found the bleeder wire "is not known to create an arc of that magnitude." (*Id.* at 5). These reviews and methods provide a reliable foundation for Averrett's opinions regarding the bleeder wire.

In ruling out a fault with the switchgear as a possible cause of the arc flash, Averrett explained that a visual inspection and a MEG test of the switchgear did not reveal any faults. (*Id.* at 6). In ruling out a fault with the hot stick as a possible cause, Averrett noted that the hot stick passed his visual inspection. (*Id.*). Averrett ruled out static electricity as a possible cause with the same evidence on which he relied to rule out debris. (*Id.*). And he ruled out user error as a possible cause because he reviewed all of the testimony provided to him and "found that everyone on site

---

[3] ABB's attempt to diminish Averrett's experiment because he used his hands instead of a hot stick is unavailing. Averrett explained why he considered his finding reliable even though he did not use a hot stick: "this would have been even more difficult if using a hot stick." (Doc. 56-10 at 5). ABB is free at trial to challenge the weight of Averrett's experiment because he used his hands instead of a hot stick, but the alleged fault with the experiment does not raise a Rule 702 reliability issue. Likewise, ABB's argument that Averrett's tests are unreliable because he only tested an exemplar voltage sensor goes to the weight and credibility of Averrett's opinions, not reliability under Rule 702.

acted reasonably and did nothing to contribute to this incident." (*Id.*). Therefore, Averrett used reliable methodology in excluding alternative causes of the arc flash.

In addition, reliably ruling out alternative causes, as Averrett did, is itself a reliable method for opining that a manufacturing defect more likely than not caused an injury. *See Thompson v. Louisville Ladder Grp., LLC*, No. 2:05-CV-0701-JHH, 2006 WL 8437006, at *5 (N.D. Ala. Sept. 12, 2006) (finding "expert opinions on causation are admissible where the expert 'provides a step-by-step and transparent account of the explanations he has considered, the physical indicia he associates with each possible alternative cause, and his reasons for excluding each of the alternative causes,'" and excluding an expert's theory of causation in an AEMLD case because he did not analyze whether an alternative theory was possible) (quoting *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1342-43 (M.D. Ala. 2001)); *Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 3:11-CV-295-WKW, 2013 WL 6145647, at *3 (M.D. Ala. Nov. 21, 2013) ("[I]n addition to conducting a detailed visual, tactile, and diagnostic examination of the subject tire prior to rendering his opinions, [an expert] also conducted a differential diagnosis whereby he eliminated other potential causes of failure based on the absence or presence of other certain signs on the subject tire. Such a process of elimination is an appropriate and accepted methodology."); *Nicholson*, 2016 WL 854370, at *9-10 (finding an expert provided reliable causation testimony because he rejected alternative explanations for a motor vehicle accident by reviewing documents, conducting two inspections of the subject vehicle, performing various tests and measurements on the vehicle's allegedly defective braking system, and observing reenactments of the accident sequence); *Rudd*, 127 F. Supp. 2d at 1342-43 (M.D. Ala. 2001) (finding an expert's process of eliminating alternative explanations for the failure of a truck's fan blade in an AEMLD case was a reliable method for opining that a manufacturing defect caused the failure). In this case, Averrett

provided sound reasons for rejecting six alternative causes of the arc flash, and he therefore has a reliable foundation for his opinion that a manufacturing defect caused the arc flash.

### 3.   Whether Averrett's Opinions Would Assist a Jury

Finally, ABB asserts Averrett's opinions would not assist the jury because they are purely speculative.  (Doc. 43 at 5, 23-25; *see also* doc. 41 at 10-14).  As evidence, ABB cites several excerpts of Averrett's deposition where he testified he could not identify the latent manufacturing defect in the voltage sensor, that a defect only "could have" caused the arc flash, and that his causation theory was a "thought" or "feeling."  (Doc. 41 at 10-14; doc. 43 at 23-25).  For example, Averrett testified: seating and unseating the insulating cap or the routine force used to release the tight fit of the cap "could have exacerbated a latent defect in the product;" the defect was "an unknown latent defect;" "I don't know the defect in the material.  I know the outcome;" "the [E]lastimold material there, I think failed to . . . I feel like that there is where the damage was, the latent defect, as I call it . . . [i]n that vicinity;"  "I don't know exactly how [the latent defect] occurred in the manufacturing process.  I just know that it occurred;" and "I don't know that this defect would have been such that you could see it.  I don't know that.  Maybe it was a major defect . . . .  Maybe it was just a minor defect."  (Doc. 56-7 at 16 (58:4-14, 59:1-3, 59:19-20), 18 (65:14-23), 27 (103:16-21)).

Anderson is not required to identify the specific defect in the voltage sensor to state an AEMLD claim.  *See Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992) ("A plaintiff does not have to establish the specific defect that caused his injury, only that the product was unreasonably dangerous."); *McDaniel v. Mylan, Inc.*, No. 7:19-CV-00209-LSC, 2019 WL 11638407, at *6 (N.D. Ala. Dec. 16, 2019) ("[P]roof of the specific manufacturing error is not a required element of the [AEMLD] claim.").  Thus, Averrett's inability to identify the exact

16

manufacturing defect and his arguably indefinite characterizations of his opinions do not render his testimony unhelpful.

Anderson is, however, required to "affirmatively show a defect in the product." *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001). Averrett's expert testimony will assist the jury in deciding whether Anderson has made that showing. As explained above, Averrett's testimony eliminating alternative causes of the arc flash is reliable and constitutes circumstantial evidence from which a jury could find that a manufacturing defect was present in the voltage sensor.

Averrett is qualified to render opinions regarding the cause of the arc flash, his opinions are based on reliable methodology, and his testimony will assist the trier of fact and is not purely speculative. Therefore, ABB's motion to exclude Averrett as an expert witness is due to be denied.

### B. ABB's Motion to Exclude Thomas Caldwell

Anderson's expert witness Thomas Caldwell ("Caldwell") is a materials engineer with 49 years of experience with the design and manufacture of metal products for several industries. (Doc. 55-3 at 5). His work includes analyzing failures and determining failure modes in metal and polymer components. (*Id.*). He has a master's degree in metallurgy from MIT and has published six peer-reviewed papers in the fields of electrochemistry and materials processing. (*Id.*).

Anderson retained Caldwell to form opinions about "the propriety of the ABB quality management system for controlling the quality of the Elastimold 650REVSIB-15v Resistance Elbow Voltage Sensor ABB manufactured during the time frame of 2014-2015." (*Id.* at 4). Caldwell initially reviewed, among other documents, ABB's voltage sensor and related products drawings and specifications, electrical testing documents, plant organization charts, operation setup, work and inspection instructions, a process failure mode effects analysis for a critical

process step, and non-conformance procedures.  (*Id.* at 9).  After he completed his first review and expert report, ABB provided additional documents more specific to the voltage sensor at issue. (*Id.* at 4, 24, 49).   Caldwell reviewed these additional documents and amended his report accordingly.  (*Id.* at 22).

Caldwell reached several opinions about flaws in ABB's quality management system for the manufacture of the voltage sensor.  (*Id.* at 32-33).  He opined that ABB's quality management system existing in 2014-2015, the time period during which Alabama Power purchased the subject voltage sensor, "lacked documents and procedures considered necessary to operate a manufacturing process consistently meeting product specifications."  (*Id.* at 32).  ABB had "an incomplete Process Control Plan for the . . . voltage sensor" and lacked evidence it prepared a "Failure Mode and Effects Analysis" for the voltage sensor.  (*Id.*).  Both documents, according to Caldwell, "are necessary elements of a manufacturing process for a performance or safety critical device."  (*Id.*).

Caldwell opined ABB lacked several other important quality control measures: unreliable pass/fail inspection methods; no collected variable data to calculate capability indices for key product characteristics; and no proven methods for assessing and improving the manufacturing process.  (*Id.*)  Caldwell reported, "From the Failure Mode and Effects Analysis, it was foreseeable that defective . . . voltage sensors could have entered the stream of commerce in the time period of 2014-2015."  (*Id.* at 33).  Caldwell considered his "assessment of the weakness of ABB process control and inspection procedures for manufacturing the . . . voltage sensor" congruent with the ABB investigative team's and Averrett's conclusions, which Caldwell described as conclusions that "a manufacturing defect was the root cause of the Incident."  (*Id.*).  Finally, Caldwell opined that appropriate process controls could have prevented the defect that Averrett proposed.  (*Id.*).

In its motion in limine, ABB contends Caldwell should be precluded from testifying because his opinions "are entirely devoid of any reliable methodology and will not assist the jury." (Doc. 42 at 1).  According to ABB, Caldwell's analysis "is based on a threadbare investigation, unfamiliarity with ABB's manufacturing operations, and an extraordinarily rushed review of limited documents."  (Doc. 43 at 25).  ABB faults Caldwell for having never seen ABB's manufacturing facilities or the incident voltage sensor, not knowing "if x-rays or electrical tests would pick up in-process delays that were inspected for visually," not knowing what machines and maintenance procedures ABB utilizes, and performing an allegedly rushed review because he was retained 19 days before Anderson's expert disclosure deadline.  (*Id.* at 26-28).

But ABB's arguments are appropriate for cross-examination, not for assessing the admissibility of Caldwell's testimony under Rule 702.  Caldwell's opinions are reliable because they flow directly from his well-explained analysis of relevant facts and data found in ABB's manufacturing documents.  His testimony is "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known," *Daubert*, 509 U.S. at 590, and there is no "gap between the data and the opinion proffered," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Moreover, his opinions regarding the flaws in ABB's quality management systems will assist the jury in deciding whether ABB produced and sold a defective product for Anderson's AEMLD claim and whether ABB should have foreseen a risk of danger for his negligence and wantonness claim. Therefore, ABB's motion to exclude Caldwell as an expert witness is due to be denied.

### C. Anderson's Motion to Exclude Stanley Szyszko

Stanley Szyszko ("Szyszko") is a Senior Engineering Manager at ABB's research and development facility in Hackettstown, New Jersey.  (Doc. 49-1 at 6 (10:17-11:2)).  He has a bachelor's degree in mechanical engineering technology from the New Jersey Institute of

Technology.  (*Id.* at 6-7 (13:13-14:12)).  He has worked for ABB since 1996.  (*Id.* at 7 (14:19-21); *see id.* at 7 (14:23-15:16)).  During that time, he evaluated the metallic compounds of materials within voltage sensors to ensure an adequate connection for electrical distribution of power, requalified and tested components according to IEEE standards, and, as a process engineer, monitored the testing results of switchgear.  (*Id.* at 10 (26:18-27:8), 12 (35:4-36:12)).

Szyszko is ABB's Rule 30(b)(6) representative.  (*See id.* at 1, 5).  ABB also disclosed him as a "hybrid witness" pursuant to Rule 26(a)(2)(C), (doc. 49-12 at 3); *i.e.*, a witness not retained or specifically employed to provide expert testimony, but who may offer both lay witness and expert witness testimony, *see* Fed R. Civ. P. 26(a)(2)(B)-(C).  Rule 26 requires the proponent of a hybrid witness to disclose the subject matter of the witness's anticipated expert testimony and a summary of the facts and opinions to which he expects to testify.  Fed. R. Civ. P. 26(a)(2)(C)(i)-(ii).  A hybrid witness does not need to provide a written expert report.  *See* Fed. R. Civ. P. 26(a)(2)(B)-(C).

ABB disclosed Szyszko's anticipated testimony as follows:

> Mr. Szyszko may provide technical or other specialized testimony and information regarding the history, design, manufacturing processes, testing, functionality, and/or usage of the 650REVSIB product made the basis of this lawsuit, consistent with his deposition testimony on March 4, 2020.  He may provide testimony regarding how the product works and is utilized, some of which may be highly technical, so his testimony will be helpful to the trier of fact.  He may also offer testimony regarding specialized or technical issues relating to the IEEE standards to which the product conforms and is tested, various design issues relating to the standards, and the specifics of the manufacturing and testing processes utilized to ensure conformity with the relevant standards.  Mr. Szyszko may also testify about the manufacturing and testing processes employed at ABB to ensure high quality and safe products.

(Doc. 49-12 at 3-4).  In his motion in limine, Anderson contends this disclosure does not provide the information required by Rule 26(a)(2)(C), Szyszko's deposition testimony did not provide any

further clarity, and Szyszko does not satisfy the *Daubert* factors even as a Rule 26(a)(2)(C) witness.  (Doc. 48 at 8-11).  For the following reasons, the undersigned disagrees.

First, ABB's disclosure of Szyszko's anticipated testimony satisfies Rule 26(a)(2)(C).  The paragraph in ABB's expert disclosure reproduced above unambiguously identified the subject matter of Szyszko's anticipated expert testimony and a summary of the facts and opinions to which he expects to testify, and therefore provided Anderson "a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses" as required by Rule 26.  *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (internal quotation marks omitted).  Indeed, Anderson deposed Szyszko twice in this case, including once after ABB's expert disclosures.  (Docs. 49-1 & 49-3).

Second, Szyszko's several years of hands-on experience with the voltage sensor as an engineer qualifies him to testify as an expert about the manufacture and functionality of the voltage sensor under Rule 702 and *Daubert*.  (*See* doc. 49-1 at 7 (14:19-16:16), 10 (26:18-27:8), 12 (35:4-36:12)).  His methodology of forming opinions based on his specialized experience and review of manufacturing procedures and case materials is reliable.  (*See* doc. 49-3 at 5 (8:3-9:8), 7-8 (17:22-18:4)).  His testimony will assist the trier of fact in understanding the manufacture and operation of the voltage sensor and in finding the cause of the arc flash.  Thus, Anderson's motion to exclude Szyszko as an expert witness is denied.

### D. Anderson's Motion to Exclude Ronald Kilgore

ABB's expert witness Ronald Kilgore ("Kilgore") has more than 30 years of experience as a forensic investigative engineer.  (Doc. 49-13 at 21).  He specializes in analyzing electrical failures resulting in fires, explosions, equipment damage, or personal injury.  (*Id.*).  He has examined and

documented more than 2500 fires in his career, has provided expert testimony in other cases, and routinely performs litigation consulting.  (*Id.*).

ABB retained Kilgore to investigate the circumstances surrounding the arc flash event.  (*Id.* at 5).  Kilgore examined the voltage sensor, insulating cap, bleeder wire, and switchgear cabinet associated with the incident, inspected an exemplar voltage sensor and insulating cap, inspected the accident site, conducted an experiment to determine whether the bleeder wire could have become trapped in the insulating cap, and reviewed, among other materials, several documents regarding the incident and the equipment involved.  (*Id.* at 5-6, 13-18).  His expert report describes the incident, the functionality of and damage to the equipment involved, quality control tests of voltage sensors, the mock-up of the ground wire trapping, and the circumstances that can cause an arc flash.  (*Id.* at 7-19).  Based on his investigation, Kilgore opined the arc flash occurred because the bleeder wire became trapped within the insulating cap when Anderson was reseating the insulating cap.  (*Id.* at 7, 19).  Kilgore did not attribute the wire entrapment to a manufacturing defect, and instead opined Anderson routed the wire.  (*Id.*).

Also, Kilgore found Anderson's failure to wear proper personal protective equipment caused his injuries.  (*Id.*).  Alabama Power requires linemen to wear long-sleeved fire-rated clothing when working within six feet of the equipment involved.  (*Id.*).  Kilgore opined Anderson was likely working within six feet of the equipment.  (*Id.* at 7, 19-20).

Finally, Kilgore ruled out a manufacturing defect as a cause of the arc flash.  (*Id.* at 7, 20).  His examination revealed no evidence of a manufacturing defect in the voltage sensor, and he stated ABB's manufacturing tests would have discovered any possible manufacturing defect that could have caused the arc flash.  (*Id.*).

22

In his motion in limine, Anderson contends that Kilgore should be precluded from testifying that faulty placement of the bleeder wire caused the arc flash and that Anderson violated Alabama Power safety rules because, according to Anderson, no evidence on the record supports Kilgore's opinions. (Doc. 48 at 11-15). These arguments do not raise a Rule 702 or *Daubert* issue. A jury, not the court, will weigh the evidence underlying Kilgore's testimony. Therefore, Anderson's motion to exclude Kilgore as an expert witness will be denied.

### E. Anderson's Motion to Exclude Dr. Jose Osorio

ABB's expert witness Dr. Jose Osorio ("Dr. Osorio") is the Director of Cardiac Electrophysiology and the Atrial Fibrillation Clinic at Grandview Medical Center in Birmingham, Alabama and an undisputed expert in cardiovascular health. (Doc. 49-15 at 3). ABB retained Dr. Osorio to render opinions on Anderson's cardiac condition, medical condition, and prognosis following the injuries he suffered from the arc flash. (*Id.*). Dr. Osorio reviewed Anderson's medical records, expert reports, deposition transcripts, and medical literature. (*Id.*). He found, among other opinions, Anderson was at risk for developing atrial fibrillation because of a history of hypertension prior to the incident. (*Id.* at 8).

In his motion in limine, Anderson contends Dr. Osorio should be precluded from testifying that Anderson had a history of hypertension because no evidence supports he had a history of hypertension. (Doc. 48 at 15). This argument calls on the court to impermissibly weigh evidence at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (stating that "the weighing of the evidence," among other things, is a jury function, not that of a judge at summary judgment or otherwise); see generally FED. R. CIV. P. 56. Dr. Osorio testified he found evidence of hypertension in Anderson's medical records because of two elevated blood pressure readings, one in November 2016 and one in July 2018. (*See* doc. 49-10 at 12-13 (37:7-

41:25)).  Dr. Osorio also testified no doctor ever diagnosed Anderson with hypertension and that it is not medically sound to diagnose a person with hypertension based only on two elevated blood pressure readings measured two years apart.  (*See id.* at 13 (38:7-41:21)).  At trial, Anderson may challenge Dr. Osorio's opinions based on this potentially inconsistent testimony, but a classic factual dispute like this one is not a proper basis for excluding an expert witness.  The motion to exclude Dr. Osorio is due to be denied.

### IV. Analysis of the Motions for Summary Judgment

#### A. Anderson's Motion for Partial Summary Judgment as to ABB's Affirmative Defenses

In its answer to the complaint, ABB asserted 13 affirmative defenses.  (Doc. 5 at 4-9).  Anderson contends he is entitled to summary judgment on eight of those defenses: (1) the complaint fails to state a claim upon which relief can be granted; (2) ABB owed no duty to Anderson; (3) failure to mitigate damages; (4) contributory negligence or fault of other persons; (5) the doctrine of setoff with respect to any *pro tanto* settlements or judgments; (6) the state-of-the-art doctrine; (7) statute of limitations; and (8) the doctrines of waiver, estoppel, or laches.  (Doc. 42 at 1; *see* doc. 5 at 4-5, ¶¶ 1-2, 5-6, 8-11).  Anderson argues there is no evidence of a genuine issue of material fact supporting any of those affirmative defenses.  (Doc 42 at 1).

ABB concedes that discovery has not revealed any evidence supporting the affirmative defenses of a failure to state a claim, setoff, the state-of-the-art doctrine, statute of limitations, and wavier, estoppel, or laches.  (Doc. 61 at 3, 9).  ABB is willing to withdraw those defenses.  (*Id.*).  Accordingly, those defenses will be stricken from ABB's answer.

Anderson's motion for partial summary judgment as to the remaining affirmative defenses will be denied.  First, ABB's contention that it owed no duty to Anderson, though labeled as an affirmative defense in ABB's answer, is not actually an affirmative defense.  Instead, it is a

standard denial of one element of Anderson's negligence and wantonness claims.  Such a defense "which points out a defect in the plaintiff's prima facie case is not an affirmative defense."  *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988); *see id.* ("These defenses are excluded from the definition of affirmative defense in Fed. R. Civ. P. 8(c).") (internal quotation marks omitted); *Chartis Aerospace Ins. Servs., Inc. v. AUA, Inc.*, No. 2:12-CV-1087-JHH, 2012 WL 13019112, at *1 (N.D. Ala. July 24, 2012) ("If an affirmative defense points out a defect in the prima facie case, that affirmative defense is not actually an affirmative defense, it is a denial.").  Summary judgment on this defense would improperly restrict ABB from contesting Anderson's ability to prove all of the legally required elements of his negligence and wantonness claims at trial.

Second, contrary to Anderson's assertions, a genuine dispute of material fact as to whether he mitigated his damages does exist.  Deposition testimony from Anderson, his treating cardiologist, and his vocational expert establish Anderson timely sought medical assistance after the incident, has been treated ever since, and has significant work limitations because of his injuries.  (Doc. 49-4 at 18-19 (65:10-72:2); doc. 56-4 at 15 (47:4-49:13), 20 (68:8-69:14); *see* doc. 60 at 18-20 (66:1-76:7)).  Anderson testified he has tried to find employment but cannot work; he specifically mentioned being unable to work at Publix because of the accommodations that would be required for his limitations.  (Doc. 49-4 at 25 (94:17-95:3)).  Dr. Osorio, on the other hand, testified Anderson could return to all usual activities with no limitations, could climb ladders, and could perform manual labor.  (Doc. 49-10 at 21 (72:20-73:19)).  A reasonable jury could credit Dr. Osorio's testimony and find a reasonably prudent person in Anderson's position would have found work to mitigate his consequential economic damages after the incident but that Anderson did not.  *See Avco Fin. Servs., Inc. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994) ("[A] plaintiff can

recover only for that damage or loss that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss. . . .  [W]hether the plaintiff has sufficiently mitigated the damages, generally speaking, is a question of fact.").  On the other hand, a reasonable jury could credit Anderson's and his experts' testimony and find that he could not work.  Therefore, a genuine dispute of material fact exists as to ABB's defense that Anderson failed to mitigate his damages.

Finally, a genuine dispute of material fact exists as to ABB's affirmative defense that Anderson's injuries were caused or contributed to by the negligence of others.  A reasonable jury could find Anderson contributed to his injuries by wearing a short-sleeved shirt, (*see* doc. 49-4 at 22 (81:12-14)), based on testimony from Paul Simmons, Alabama Power's Safety and Health Supervisor who was a lineman for more than 20 years, that he would have worn a whole body covering of flame-resistant clothing and a long-sleeved shirt when working on the electrical switchgear with the hot stick, (doc. 60-2 at 17 (56:7-57:9)).  Similarly, a reasonable jury could find Alabama Power contributed to Anderson's injuries based on his testimony that one of Alabama Power's safety manuals did not require linemen to wear long-sleeved shirts when working six feet or further away from switchgear.  (*See* doc. 49-4 at 22 (81:15-23)).  A reasonable jury could reach the same finding based on Kilgore's testimony that Alabama Power's safety standards were not consistent with OSHA standards.  (*See* doc. 49-8 at 22 (74:4-75:2)).  Of course, a reasonable jury could also find Anderson reasonably followed Alabama Power's procedures and those procedures were reasonable.  Therefore, a genuine dispute of material fact exists as to ABB's affirmative defense that others were responsible for Anderson's injuries.

For the aforementioned reasons, Anderson's motion for partial summary judgment is due to be denied except for the enumerated affirmative defenses that will be stricken.

**B. ABB's Motion for Summary Judgment**

ABB moves for summary judgment on all of Anderson's claims: AEMLD, negligence and wantonness, and failure to warn.  For the following reasons, summary judgment is due to be granted as to the wantonness and failure to warn claims, and summary judgment is due to be denied as to the AEMLD and negligence claims.

**1. AEMLD**

To state a claim under the AEMLD, a plaintiff must show:

(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it [was] sold.

*Morguson*, 857 So. 2d at 800 (internal quotation marks omitted).  A product is "defective" under the AEMLD if it "does not meet the reasonable expectations of an ordinary consumer as to its safety, and [a] 'defect' is that which renders a product 'unreasonably dangerous,' *i.e.*, not fit for its intended purpose." *Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1183 (Ala. 1985) (internal quotation marks omitted).  Furthermore, "[t]he plaintiff has the burden of presenting substantial evidence of proximate cause. . . .  Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur." *Morguson*, 857 So. 2d at 800 (internal citations and quotation marks omitted).

Here, Anderson offers evidence showing a genuine issue of whether ABB sold the voltage sensor in a defective condition unreasonably dangerous to him as an ultimate user.  As explained above when discussing the admissibility of his expert testimony, Averrett testified an unknown

latent manufacturing defect in the voltage sensor was exposed when Anderson unseated the insulating cap.  (Doc. 56-10 at 7).  A reasonable jury could credit Averrett's testimony and find the voltage sensor was defective under the AEMLD because, as explained in detail above, Anderson does not need to identify the specific defect, *see, e.g.*, *Goree*, 958 F.2d at 1541, *and McDaniel*, 2019 WL 11638407, at *6, and Averrett reliably ruled out six other possible causes of the arc flash, *see, e.g.*, *Thompson*, 2006 WL 8437006, at *5; *Rudd*, 127 F. Supp. 2d at 1342-43.

Likewise, Averrett's testimony that the manufacturing defect caused the arc flash shows a genuine issue of causation.  Therefore, Anderson has shown the existence of a genuine issue of material fact as to each element of his AEMLD claim and summary judgment is due to be denied.

### 2. Negligence and Wantonness

Negligence and wantonness claims based on an allegedly defective product remain viable despite the AEMLD's existence.  *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 34 (Ala. 2003).  A plaintiff pursuing an AEMLD claim against the manufacturer of an allegedly defective product must go one step further to prove a negligence claim.  Proof that a product was defective "is sufficient to succeed on the AEMLD claim," but, "[i]n a negligence case, the plaintiff must establish not only that the product at issue is defective, but also that the manufacturer failed to exercise due care in the product's manufacture, design, or sale."  *McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So. 3d 769, 772 (Ala. 2012).  To establish a negligence claim against a manufacturer under Alabama law, a plaintiff must prove the traditional elements of duty, breach of duty, proximate cause, and injury.  *Yamaha Motor Co. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991).

Here, a genuine dispute exists as to whether ABB exercised due care in the manufacture of the voltage sensor.  As discussed above, Averrett testified an unknown latent manufacturing defect

was present in the voltage sensor and caused the arc flash, and Caldwell testified ABB's lack of several quality control processes in the manufacture of the voltage sensor could have made it foreseeable that the voltage sensor would enter the stream of commerce in a defective condition. A reasonable jury could credit these two experts' testimony and find ABB failed to exercise reasonable care in manufacturing the voltage sensor and proximately caused foreseeable harm to Anderson.  Therefore, summary judgment is due to be denied as to the negligence claim.

The same is not true with respect to the wantonness claim.  To establish a wantonness claim, a plaintiff must prove "the conscious doing of some act or the omission of some duty while knowing of the existing conditions *and* being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *McMahon*, 95 So. 3d at 773 (emphasis in original).  The record contains no evidence supporting an inference that anybody at ABB was consciously aware of an unsafe manufacturing process or the probability of injury resulting from that process. Therefore, summary judgment is due to be granted on the wantonness claim.

### 3. Failure to Warn

Anderson has not opposed summary judgment on his failure to warn claim.  (*See* doc. 59 at 6, 35).  Therefore, summary judgment is due to be granted on that claim.

### V. Conclusion

For the reasons stated above, ABB's and Anderson's motions in limine (docs. 42 & 48) are due to be **DENIED**.  Anderson's motion for partial summary judgment (doc. 46) is due to be **DENIED**, except that affirmative defenses that ABB is willing to withdraw will be **STRICKEN**. ABB's motion for summary judgment (doc. 40) is due to be **GRANTED IN PART AND DENIED IN PART**.  There are no genuine issues of material fact and ABB is entitled to judgment as a matter of law with respect to the wantonness and failure to warn claims, so ABB's motion for

summary judgment is due to be **GRANTED** with respect to the wantonness and failure to warn claims and those claims will be dismissed.  But genuine issues of material fact exist with respect to the AEMLD and negligence claims, so ABB's motion for summary judgment is due to be **DENIED** with respect to the AEMLD and negligence claims, and those claims will proceed to trial.  A separate order will be entered.

DONE this 15th day of March, 2022.

_____

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE